**Robert MYERS and Steven R. Myers, Plaintiffs–Appellees,**

v.

**COUNTY OF LAKE, INDIANA, Defendant–Appellant.**

No. 93–2469.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 5, 1994.

Decided July 22, 1994.

A jury concluded that the LCJC negligently failed to take precautions against suicide attempts, and Lake County appeals from an award of $600,000 in damages to Steven and his father Robert.

## I

■ All parties to this case are citizens of Indiana. Plaintiffs invoked federal jurisdiction on the theory that the LCJC's deliberate indifference to suicide risks violated the due process clause of the fourteenth amendment, permitting recovery under 42 U.S.C. § 1983 and supplying jurisdiction under 28 U.S.C. § 1343(a)(3). Shortly before trial the magistrate judge, presiding by consent under 28 U.S.C. § 636(c), granted summary judgment on the constitutional claim, ruling that plaintiffs had not produced evidence that the defendants acted with the mental state necessary to violate the Constitution. See *Tittle v. Jefferson County Commission*, 10 F.3d 1535 (11th Cir.1994) (en banc) (minimum mental state is "deliberate indifference" to suicide risk); cf. *Farmer v. Brennan*, —— U.S. ——, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *McGill v. Duckworth*, 944 F.2d 344 (7th Cir. 1991). That decision left for trial only plaintiffs' negligence claim under Indiana law, which lacks an independent basis of federal jurisdiction. The magistrate judge exercised supplemental jurisdiction, see 28 U.S.C. § 1367, on the theory that the constitutional claim had been resolved such a short time before trial that it would be more convenient to continue the federal proceeding than to resume the case in state court.

Ivan E. Bodensteiner (argued), Terry E. Johnston, Valparaiso, IN, for plaintiffs-appellees.

Robert P. Kennedy, F. Amin Istrabadi (argued), Spangler, Jennings & Dougherty, Merrillville, IN, for defendant-appellant.

Before EASTERBROOK and RIPPLE, Circuit Judges, and MIHM, District Judge.*

EASTERBROOK, Circuit Judge.

Steven Myers, age 16, was in the custody of Lake County, Indiana, during 1988 as a juvenile delinquent. While at an "open" facility he stole a staff member's car, leading to a transfer to more secure custody at the Lake County Juvenile Center (LCJC). Steven had been at the LCJC before, and his caseworker believed that he would be better off at a facility in Maine specializing in intelligent children who treated ordinary detention facilities as challenges to be overcome. On December 27, 1988, a state court authorized Steven's transfer to Maine. Eight days later, while still at the LCJC, Steven hanged himself with a sheet. He survived but suffered severe and permanent brain damage.

Whether it was prudent to try this case in federal court may be doubted. Before the enactment of § 1367 in 1990, we took the position that the dismissal of the federal claim on the eve of trial is not by itself sufficient to justify resolving the remaining claims in federal court. *Olive Can Co. v. Martin*, 906 F.2d 1147, 1153 (7th Cir.1990); *Manor Healthcare Corp. v. Guzzo*, 894 F.2d 919, 922 (7th Cir.1990). Section 1367(d), giving the plaintiff at least 30 days to re-file in state court after a federal court declines to exercise supplemental jurisdiction, removes

* Hon. Michael M. Mihm, Chief Judge of the Central District of Illinois, sitting by designation.

the principal reason for retaining a case in federal court when the federal claim belatedly disappears. Our case presents several novel issues under Indiana law, and such contentions presumptively belong in state court—especially when a unit of state government is a defendant. How far state law exposes state and local agencies to liability is a delicate question that federal judges should hesitate to tackle. See *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). We held in *Brazinski v. Amoco Petroleum Additives Co.*, 6 F.3d 1176, 1181–82 (7th Cir.1993), that the enactment of § 1367 did not change the standards guiding the exercise of discretion to hear pendent claims, which implies that the magistrate judge should not have tried this case. But see *Executive Software North America, Inc. v. United States District Court*, 24 F.3d 1545 (9th Cir.1994) (disagreeing with *Brazinski*).

Neither side has questioned the exercise of supplemental jurisdiction, however. Whether or not it was a good idea to try the case in federal court in the first place, it is assuredly a bad idea to shuttle a case from one system of courts to another after trial, when no one asserts injury from the choice of forum. One trial per case is enough. A desire to curtail the cost of litigation is inadequate to support the judgment if the federal court lacks the *power* to decide. Litigants may not stipulate to federal jurisdiction, and federal judges must respect the limits on their adjudicatory power even if all litigants are content with the decision. The American Law Institute has questioned even this principle, calling dismissal of a case because of belated discovery of jurisdictional problems a "fetish of federal jurisdiction ... wholly inconsistent with sound judicial administration [that] can only serve to diminish respect for a system that tolerates it." *Study of the Division of Jurisdiction Between State and Federal Courts* 366 (1969). The Supreme Court has not heeded the ALI's call to alter the rule that federal courts must satisfy themselves of the existence of subject-matter jurisdiction, but it has suggested that federal courts are not obliged to extend this directive to its maximum possible extent. See *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989) (holding that courts may permit a change in the identity of parties to preserve jurisdiction, even though subject-matter jurisdiction was absent at the outset of the case).

To date, no court has considered the extent to which judges must resolve questions under § 1367 without prompting from the parties. Section 1367 divides into stages the identification of pendent claims suitable for federal adjudication. Section 1367(a) spells out the limits of supplemental jurisdiction:

> [T]he district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original [federal] jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

Section 1367(b) limits this principle in certain cases under the diversity jurisdiction; these restrictions do not concern us here. Section 1367(c) provides:

> The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—
>
> (1) the claim raises a novel or complex issue of State law,
>
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
>
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
>
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

Section 1367(c), identifying criteria that influence the prudent exercise of discretion to resolve claims under the supplemental jurisdiction, supposes the raw *power* to resolve these claims. Adjudicatory power comes from the link between the claim creating federal jurisdiction and the pendent claims, which must be "so related to claims in the action within such original [federal] jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

This division between the requisites of judicial competence in § 1367(a) and the criteria for the exercise of discretion in § 1367(c) also marks, we believe, the division between matters the court must examine on its own and those that depend on an assertion of error by the litigants. A court must satisfy itself that a claim falls within the category laid out in § 1367(a), for otherwise there is no federal jurisdiction. Once subject-matter jurisdiction is present, the district court "may decline to exercise supplemental jurisdiction," but a court's failure to act wisely in the exercise of this discretion does not justify forcing the litigants to start from scratch in state court. An imprudent exercise of supplemental jurisdiction injures litigants in other federal cases, for they must wait in a longer queue. Nothing the court of appeals can do after the case has already been tried can redress this injury. Vacating the judgment would add to these litigants' costs—and lengthen the queue in state court—without offering benefits to other litigants in federal court. Although the prospect of appellate dismissal *sua sponte* would make district courts more sensitive to their duties under § 1367(c), the cost of the marginal improvement would be high and the benefits remote.

Plaintiffs' claim under § 1983 fell within federal jurisdiction. They lost, not because of any defect in their legal theory, but because of a failure of proof. Their claims under Indiana law are "part of the same case or controversy"; there is only one nucleus of operative facts, one *claim* with different legal theories offered in support of recovery. Subject-matter jurisdiction under § 1367(a) is secure. Because no one has contested the magistrate judge's decision to exercise supplemental jurisdiction, that is as far as we need go. Accord, *Schneider v. TRW, Inc.,* 938 F.2d 986, 993 (9th Cir.1991) (same conclusion under law preceding § 1367).

## II

■ Indiana requires institutions to use reasonable care to prevent their wards from committing suicide. *Fowler v. Norways Sanatorium,* 112 Ind.App. 347, 42 N.E.2d 415 (1942); *Breese v. State,* 449 N.E.2d 1098, 1104, 1117–18 (Ind.App.1983); cf. *Tittle v.*

*Mahan,* 582 N.E.2d 796, 801 (Ind.1991). These opinions recognize that public employees fill the roles of parents and relatives, who may watch over their loved ones in times of stress—that, indeed, the state institutions may be the *source* of the stress pushing troubled youths toward the brink, something that may well have occurred here. (Steven Myers testified that he tried to commit suicide because he did not want to be sent to Maine, far away from his family.) See generally *Restatement (2d) of Torts* § 314A(4) (1965). Indiana does not impose absolute liability on custodians for their charges' suicide attempts, however. Clever inmates can commit suicide no matter what the staff does to curtail their opportunities. Absolute liability would induce public bodies to meet even a slight risk with severe precautions. Because these precautions are unpleasant—inmates may be deprived not only of belts and ties but also of pens, sheets, blankets, even clothing, for almost any object may be used to harm oneself—a humane custodian seeks to confine their use to persons at substantial risk.

■ Predicting suicide is impossible. At best psychologists can group inmates according to risk. False positives are common; that is to say, most persons in these high-risk categories do not attempt to harm themselves. See David Lester & Bruce L. Danto, *Suicide Behind Bars: Prediction and Prevention* 23–36, 75–101 (1983); Madelyn S. Gould *et al.,* "The Clinical Prediction of Adolescent Suicide," in *Assessment and Prediction of Suicide* 130–43 (Ronald W. Maris *et al.,* eds., 1992); Ronald L. Bonner, "Isolation, Seclusion, and Psychosocial Vulnerability as Risk Factors for Suicide Behind Bars," *id.* 112 Ind.App. at 398–419. A duty to take maximum precautions would make life miserable for the many persons who are in categories of risk and could be consigned to months if not years without clothing (or even to spend time in restraints) despite an objectively low probability of harm. Thus the duty "is always that of reasonable care". *Breese,* 449 N.E.2d at 1104. Failure to prevent a given suicide attempt does not necessarily show the lack of care.

Lake County contends that nothing in the record shows that the staff of the LCJC knew that Steven was depressed or contemplating suicide. Consequently, it contends, "reasonable care" did not entail placing Steven on suicide watch and depriving him of sheets and other items that he could use to harm himself. One staff member of the LCJC after another testified that he did not notice anything out of the ordinary about Steven's behavior. If that testimony were all the record contained, we would agree with Lake County that reasonable jurors could not find negligence. (Although state law supplies the substantive standard of liability, federal law supplies the standard of review: whether reasonable persons could have found that the evidence meets the standard of substantive liability. *Mayer v. Gary Partners & Co.*, 29 F.3d 330 (7th Cir.1994).) But that is not the limit of the evidence—indeed, defendant's assessment is not even responsive to the plaintiffs' theory. Plaintiffs do not now contend that any particular member of the LCJC's staff was negligent. Instead they argue that the LCJC was so starved for funds, so shorthanded, that its staff was unable to take steps appropriate to detect and curtail suicide risks.

In 1977 Lake County signed a consent decree promising to employ one full-time psychologist for every 44 inmates at the LCJC, with the proviso that the LCJC would always have at least one full-time psychologist even if the number of children fell below 44. But the County did not live up to its promise. In January 1989, when Steven Myers hanged himself, the only psychological services were provided by a part-time employee who stopped by on Tuesdays and Thursdays. As a result, the LCJC did not routinely screen new inmates for suicide risk (or for any other purpose). Steven Myers did not see a psychologist, and his mental condition was not tested, between his arrival on December 7, 1988, and his attempted suicide on January 4, 1989, and this even though on December 27 a state court took a step (entering the transfer order) that greatly increased the stress to which he was subjected. So shorthanded was the LCJC that it did not even examine the files of youths who

had been there before. Had it done so, it would have discovered that during a previous stay at the LCJC Steven had been placed on suicide watch for depression and pronounced suicidal ideation. Caseworkers noted in the record that "[t]he child had been very depressed and has talked of suicide". This was denoted with an S in his file—but the LCJC did not look at that file. (An employee of the LCJC testified that the S was a clothing size, but the jury was not obliged to believe this.) Steven also had been on suicide watch at the Porter County Juvenile Detention Center, his location immediately preceding the transfer to the LCJC on December 7. The clinical director of a third facility where Steven had been held in 1988 testified that Steven's depression would have been "painfully obvious" when he arrived at the LCJC—but then, no one trained in such matters saw him when he arrived at the LCJC. (So the jury could believe. The psychologist testified that he did not recall seeing Steven on his admission in December 1988.) Records of other institutions that Steven had visited also contain notations that Steven was depressed and had talked of suicide. Once again, the staff at the LCJC did not see these notations, because the LCJC was so shorthanded that it did not obtain and review the files its inmates had accumulated at other institutions. Robert Myers testified that he told a member of the LCJC's staff about his son's suicidal thoughts, but that the LCJC did not respond. Institutional guidelines called for all of the LCJC's employees to have training in cardiopulmonary resuscitation; but the first employee to reach the scene had not been so trained, and he had to fetch other employees while Steven lay in cardiac arrest.

Reasonable jurors could conclude that by starving the LCJC of funds Lake County prevented the exercise of reasonable care, even though none of the LCJC's employees was personally negligent. (This is apparently what the jury thought; although it found Lake County liable, it returned verdicts in favor of the two employees of the LCJC named as defendants.) Lake County does not contend that psychological screening would have classified Steven as low suicide risk, or that a proper understanding of the

degree of that risk would have deemed it so small that precautions would inflict indignity without purpose. Instead of producing data about risk levels and the probability of proper classification, Lake County appealed to the intuitions of the jurors. Litigants who approach scientific and medical disputes from lay perspectives, as defendant did, cannot complain when jurors' intuitions differ from their own. It is possible, of course, that Steven would have attempted suicide even if he had received additional attention. He was intelligent and might have been able to fool the staff. A plaintiff need not exclude such possibilities in order to demonstrate negligence.

Lake County nonetheless contends that even if it was negligent plaintiffs cannot recover because Steven acted deliberately and was the cause of his own injury. Steven testified that he wanted to commit suicide and that he did his best to avoid detection. Defendant contends that Steven's acts may be classified as (a) an independent intervening cause, (b) contributory negligence, (c) reckless disregard of one's own safety, and (d) incurred risk. No matter which characterization is best, Lake County insists, it is entitled to prevail as a matter of law under Fed.R.Civ.P. 50, because any reasonable juror would have to conclude that one of these characterizations applies—and each, it believes, is a perfect defense under Indiana law. Yet the judge not only denied the motions for judgment as a matter of law during and after trial but also gave the jury an instruction on only one of these four characterizations:

> By law, a person is not held responsible for acts and omissions that are due to a lack of capacity to appreciate and avoid danger. If you find that the plaintiff, Steven Myers, did not have the capacity to appreciate and avoid danger because of his age and emotional and mental condition, then he cannot be guilty of contributory negligence. However, if you find that Steven Myers had the capacity to appreciate and avoid the danger, then Steven acted intentionally and cannot recover even if you also find that the defendants were negligent.

Even that instruction was unduly favorable to the plaintiffs, Lake County submits. The judge should have told the jury that contrib-utory negligence is a defense without regard to mental capacity. (The jury obviously concluded that Steven "did not have the capacity to appreciate and avoid danger because of his age and emotional and mental condition"; otherwise it would have returned a verdict for all defendants.)

■ Indiana recognizes intervening cause, reckless disregard of one's own safety, and incurred risk as defenses. E.g., *Beckett v. Clinton Prairie School Corp.*, 504 N.E.2d 552 (Ind.1987); *Foster v. Purdue University Chapter of Beta Theta Phi*, 567 N.E.2d 865 (Ind.App.1991); *Szabo v. Cwidak*, 558 N.E.2d 855, 857 (Ind.App.1990). Even contributory negligence, long since replaced by comparative negligence in private litigation, still applies if the defendant is a public agency. Ind.Code § 34-4-33-8; *Roddel v. Town of Flora*, 580 N.E.2d 255, 259 (Ind.App.1991). But Indiana has never used any of these defenses in suicide cases, and it is hard to see how it could. If the custodian has a duty to protect the inmate from himself, the fact that the inmate tried to harm himself is a reason for liability rather than a defense. But then, as Justice Holmes wrote, "[t]he life of the law has not been logic: it has been experience." *The Common Law* 1 (1881). States are free to recognize defenses that do not mesh perfectly with the rationale behind the corresponding claims for relief.

■ Our task is to predict how Indiana would answer a question it has never considered. Would it recognize intentional efforts to commit suicide as defenses to the tort of negligently failing to prevent suicide attempts? (Everything comes down to this, regardless of the legal pigeonhole used.) Surprisingly few states have addressed the subject. Although a majority of the states require prisons and hospitals to take precautions against suicide, only seven have discussed whether deliberate self-injury eliminates a negligence claim against the custodian. Five have held squarely that it does not. *DeMontiney v. Desert Manor Convalescent Center*, 144 Ariz. 6, 695 P.2d 255 (1985); *Hickey v. Zezulka*, 439 Mich. 408, 487 N.W.2d 106 (1992); *Cole v. Multnomah County*, 39 Or.App. 211, 592 P.2d 221 (1979); *Kane v. State*, 1989 WL 136963, 1989 Tenn. App. LEXIS 759 (1989); *Alvarado v. Brownsville*, 865 S.W.2d 148 (Tex.App. 1993).

One has held that it does. *Belen v. Harrell*, 93 N.M. 601, 603 P.2d 711 (1979). One more has assumed that it does, but concluded that because the person attempting suicide was drunk the facts did not establish the necessary volition. *Dezort v. Hinsdale*, 35 Ill. App.3d 703, 342 N.E.2d 468 (2d Dist.1976). We think it probable that Indiana would align itself with the majority—not only because the odds favor this, but also because the majority approach is consistent with the rationale of the tort. A duty to prevent someone from acting in a particular way logically cannot be defeated by the very action sought to be avoided. "The duty to protect the other against unreasonable risk of harm extends to risks arising out of the actor's own conduct". *Restatement (2d) of Torts* § 314A comment *d*. Of course we cannot be *sure* that Indiana would reach this conclusion, but nothing in the three Indiana cases on this subject (*Fowler, Breese,* and *Tittle* ) points the other way. Cf. *Brackett v. Peters*, 11 F.3d 78 (7th Cir.1993) (discussing the analogous rule in criminal law that an aggressor is not freed from liability by the fact that he drives his victim to inflict additional injury on himself, or even to commit suicide).

This conclusion means that the jury instruction on contributory negligence was erroneous, but that the error favored defendants. Lake County's arguments about the evidence of Steven's intent to take his own life become irrelevant. The jury was entitled to decide for plaintiffs on the merits.

## III

The jury awarded $500,000 to Steven Myers and $400,000 to his father Robert. The magistrate judge reduced these awards to $300,000 apiece, the per-person cap provided by Indiana law:

> The combined aggregate liability of all governmental entities and of all public employees, acting within the scope of their employment ..., {may} not exceed three hundred thousand dollars [$300,000] for injury to or death of one [1] person in any one [1] occurrence and {may} not exceed five million dollars [$5,000,000] for injury to or death of all persons in that occurrence. A governmental entity is not liable for punitive damages.

Ind.Code § 34-4-16.5-4 (material in brackets in original; material in braces added). Lake County believes that because Robert's injury is derivative from Steven's, the total award should be $300,000 rather than $600,000.

■ Robert's injury is derivative in the sense that he could not prevail if the jury decided against Steven, and in the further sense that his injury flows from Steven's loss. Robert's injury is independent in the sense that it covers different elements of loss: Robert recovers for Steven's medical expenses (for which Robert is fully responsible, including those to be incurred in the future by public facilities) plus the loss of the love, companionship, and services of his son; Steven recovers for loss of earning capacity plus pain and suffering. No one doubts that under Indiana law separate recoveries by parent and child are appropriate. Ind.Code § 34-1-1-8. See *Andis v. Hawkins*, 489 N.E.2d 78, 82 (Ind.App.1986); *Buffalo v. Buffalo*, 441 N.E.2d 711, 714 (Ind.App.1982) (parent and child have "two causes of action").

Section 34-4-16.5-4 sets a limit of $300,000 "for injury to ... one [1] person" in an occurrence. Robert and Steven are separate persons, suffering separate injuries. Does the fact that *liability* is derivative limit total recovery to $300,000 even though two persons suffer separate injuries? No Indiana court has addressed this question.

■ The magistrate judge drew an analogy to wrongful death actions, which in Indiana are subject to maximum recovery per person. In *Andis* and *Buffalo* the courts concluded that this maximum applies separately to a deceased child and a surviving parent. The magistrate judge believed that Indiana courts would take the same approach to the cap in Ind.Code § 34-4-16.5-4. We, too, think this likely. When setting maximum recoveries in other statutes, Indiana has included some derivative losses within a single cap. For example, Ind.Code § 27-12-14-3, which provides maximum recoveries in medical malpractice actions, includes damages for loss of consortium within the cap applicable to the injured spouse. See *St. Anthony Medical Center v. Smith*, 592 N.E.2d 732, 739 (Ind.App.1992). Ind.Code § 34-4-16.5-4 lacks a comparable provision,

leading us to believe that Indiana courts would read its per-person limit the same way they have read the per-person limit in wrongful death actions. Lake County cites a number of cases holding that multiple injuries to a single person do not justify awards exceeding $300,000, but these cases are transparently irrelevant to the question whether father and son count as two "persons" for purposes of Ind.Code § 34–4–16.5–4. Lake County does not cite, let alone attempt to distinguish, *Andis* and *Buffalo*. They are the closest parallels in state law, and we conclude that they support the judgment in this case.

AFFIRMED.