Donald K. **STRICKLER**, Plaintiff,

v.

Charles **McCORD**, as Sheriff of Miami County, Miami County Deputy Sheriffs and/or Officers/Dispatchers Jeff Baker, Rocky Price, Bill Gebhart, Matthew Fellar, Rick Ploss, and Greg Sutton, Defendants.

No. 3:02 CV–0683 AS.

United States District Court, N.D. Indiana, South Bend Division.

Feb. 17, 2004.

Samuel L. Bolinger, Samuel L. Bolinger & Associates, Fort Wayne, IN, for Plaintiff.

Robert Thomas Keen Jr., Miller, Carson, Boxberger & Murphy LLP, Fort Wayne, IN, for Defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Judge.

This cause is before the Court on the Defendants' Motion for Summary Judgement filed on August 28, 2003, and their Supplemental Motion for Summary Judgment filed on October 31, 2003. The Supplemental Motion was made necessary by the Plaintiff's Motion for Leave to File an Amended Complaint, which was granted on September 23, 2003. The Amended Complaint was filed on the same day.

The subject matter of this suit is the Plaintiff's attempted suicide on December 19, 2001, and whether the Defendants are liable for failing to prevent that attempt. As a result of his suicide attempt, the Plaintiff was hospitalized and incurred substantial medical bills. The Plaintiff filed suit under 42 U.S.C. § 1983 for violations of his rights as guaranteed by the Eighth and Fourteenth Amendments to the Constitution of the United States. He claims that the Defendants were deliberately indifferent to a substantial risk of suicide. The parties have thoroughly briefed the issues, and the Motion is ripe for ruling. Oral arguments were heard in open court on January 9, 2004, and the Court now rules as follows.

## I. JURISDICTION

Jurisdiction is premised upon this court's federal question jurisdiction pursuant to 28 U.S.C. § 1331.

## II. RELEVANT FACTS

On October 18, 2001, the Plaintiff, Donald K. Strickler, was arrested for driving under the influence of alcohol after crashing his vehicle in a one-car accident. Def.'s Mem. in Supp. at 1. In the vehicle, Strickler had whiskey, a loaded twenty-gauge shotgun and a suicide note. Strickler Dep. at 13. He was initially taken to the Wabash County Jail, where he was treated for head lacerations, then sent to the Bowen Center in Warsaw, Indiana, for observation. Def.'s Mem. in Supp. at 1. Strickler testified that a judge was contacted, and the judge ordered that he be sent to the Bowen Center for evaluation for attempted suicide, as it was his second attempt. Strickler Dep. at 10 and 13. He stated, however, that the car accident was not a suicide attempt, that he blacked out because he was intoxicated and hit a tree head-on going about 85 miles per hour. *Id.*

At the Bowen Center, Strickler was not entirely honest with the staff about being suicidal because he "[d]idn't want to get locked up in an insane asylum." Strickler Dep. at 18. When asked if he had thoughts of suicide, or he still wanted to commit suicide, he responded, "Not to-

day." *Id.* At the Bowen Center, Strickler was put on medication and required to "go through some seventy-two hours of their classes." *Id.* After three days in the Bowen Center, Strickler was taken directly to the Miami County Jail ("MCJ") because his bond was revoked on a previous matter. Strickler Dep. at p. 10.

As part of the intake process at MCJ, a booking officer named Richards asked Strickler questions and filled out a Medical Screening Questionnaire. Def.'s Ex. 4. One of the questions states, "Is he/she so disoriented or mentally confused as to suggest the risk of suicide." This question is checked "No". The Questionnaire is signed by Strickler. *Id.* He was then placed in a holding cell, where he remained throughout his stay at MCJ. Pl.'s Mem. in Opp. at 3.

Strickler believes that he was placed in the holding cell because he was known to be a suicide risk, pursuant to Miami County's written policies and procedures for handling suicidal inmates. *Id.* Defendant Bill Gebhart states, however, in his deposition that Strickler was originally placed in the holding cell because of the injuries he sustained in the auto accident. Gebhart Dep. at 14. Strickler received about fifty stitches in his forehead and fourteen in his chin as a result of the accident. Strickler Dep. at 14–15.

Shortly after Strickler was taken to MCJ, his estranged wife, Marsha, contacted her brother-in-law, Mike Fisher, a reserve officer with the Miami County Sheriff's Department, and told him about the situation. Marsha Strickler Dep. at 14. According to Fisher, Marsha stated that she had talked to someone at MCJ who told her that prior to being brought down to MCJ, Strickler was under a suicide watch. *Id.* At 12.

Fisher went to the jail to talk to Strickler and see how he was doing. Fisher also asked Strickler if there was anything he could get him. Fisher Dep. at 14. Fisher thought that, considering Strickler's injuries and the trauma he'd been through, and the fact that he was incarcerated, Strickler was "as best as could be expected." *Id.* Strickler did not say anything to Fisher about being suicidal, although he did state that he was "tired of it all" and that "he really didn't care what happened from this point." *Id.* at p. 15.

After visiting with Strickler, Fisher spoke with two deputies, Sutton and Bailey, and informed them that Strickler might be suicidal and should be watched. *Id.* The response from both officers was that it would be taken care of. *Id.* at p. 16. At this time, Strickler was in a glass enclosed cell and could be observed visually at almost all times by the officers, as well as being monitored on video. Fisher Dep. at 14; Marsha Strickler Dep. at p. 17.

Sometime in late October, 2001, Strickler asked to see a counselor. Ploss Dep. at p. 8. Pursuant to jail policy, Defendant Ploss requested an evaluation by Four County Counseling Center. *Id.* On October 30, 2001, a counselor interviewed Strickler and prepared a written report. Def.'s Ex. 5. Under the heading "Presenting problem and history", the report states, "suicidal thoughts (continue)", his wife is divorcing him, and he doesn't feel he has much to live for. *Id.* It notes that he is currently taking medication—antidepressants from the Bowen Center—and vitamins. *Id.*

Under danger to self, boxes are checked for "thoughts of suicide," and "threats of suicide"; but not for "plan for suicide", "suicide attempts", "preoccupation with death", "suicide gesture", or "family history of suicide." *Id.* It also notes that Strickler had not been able to find work since April, 2001. *Id.* The tentative principal diagnosis was alcohol dependance and depression. *Id.* However, the recommen-

dation says that Strickler is "okay to put in general jail population." *Id.* Defendant Gebhart saw the report shortly after it was received by the department. Gebhart Dep. at p. 67. Gebhart's understanding of the recommendation "okay to put in general jail population" is that the counselors "have a feeling that this man is not any harm to himself or anybody else." *Id.* at p. 70.

Apparently, after the report was received, one attempt was made to put Strickler in the general jail population. According to Strickler, Officer Warren came in and told Strickler to get his stuff, "We're going upstairs." Strickler Dep. at p. 108. They went up the elevator, but when Officer Warren started to unlock one of the cellblocks, Strickler asked him "What for." *Id.* Warren allegedly responded that Strickler can go into the cell block, then Strickler asked Warren why he was in holding. *Id.* Again according to Strickler, Warren answered, "Because you were suicidal," and Strickler replied, "What makes you think I'm still not." *Id.* Then Warren said, "Pick your shit up and let's go," and he took Strickler back to the holding cell. *Id.* at p. 109.

Defendant Gebhart stated in his Deposition that Strickler was not put in general population because Strickler did not want to "go back with a bunch of individuals," and that he felt better in the holding facility. Gebhart Dep. at 15. He testified that Strickler never said anything about suicide. *Id.* at p. 16. Defendant Ploss also testified that it was at Strickler's request that he was not placed in the general jail population. Ploss Dep. at p. 30.

In late October, 2001, Strickler wrote a letter to Patty Jo Pearce at the Miami County Probation Department, where she was employed as the Program Director for the Miami County Alcohol and Drug Court Program. Pearce Dep. at pp. 3 and 10. She responded by going over and talking with Strickler, then returned and took him a NEEDS Survey Assessment. *Id.* Based on the survey and her observation of him, Pearce prepared a six-page substance abuse evaluation of Strickler which recommended that he be assigned to a long term treatment facility, i.e., the six month program at Washington House. *Id.*

Pearce holds a Bachelor of Science Degree in chemical dependency from LaSalle University and has State certification as a Certified Alcohol and Drug Addiction Counselor. Pearce Dep. at p. 3. She has experience as a therapist for four years, where her duties included psychotherapy primarily dealing with alcohol and drug related issues. *Id.* Pearce is trained to evaluate an individual's mental status by observing the person while she is talking to him, noting such things as appearance, demeanor, and comments made. *Id.* at p. 13. Based on her observation, Pearce concluded that Strickler had been suicidal in the past, but that he was "negative for suicidal or homicidal ideation, thought, or plan." Pearce Dep. Ex. E. She noted that his appearance was appropriate, he made direct eye contact, was cooperative and stayed focused, that he smiled and was pleasant and soft spoken, oriented as to time and place, but with some memory loss regarding dates. *Id.* The Report also notes that based on the diagnostic testing NEES (sic) survey, his "needs level for supervision is maximum," but the "Risk level for supervision is medium." *Id.* Pearce expressed concern about Strickler's alcohol addiction and his general emotional instability because of his troubled marriage and the losses it would cause. Pearce Dep. at p. 14.

The evaluation performed by Pearce was not sent to the jail because it was prepared for the Probation Department. Pearce Dep. at pp. 22–3. Her reports do not become part of the record until there is a

hearing. *Id.* Copies were sent to the Prosecutor, the Probation Department, the court system, and Strickler's attorney. *Id.* at 22. However, if, based on her observations, Pearce thought that Strickler was currently suicidal, she would have advised the staff at the jail, as well as personally calling Four County for information about the Four County interview that Strickler had prior to his interview with her. *Id.* at p. 23. Pearce stated that, based upon her observations, she would not have objected to placing Strickler in a cell in the general population, where he could be observed as any other person would be. *Id.* at p. 33.

Not long after his interview with Pearce, in early or mid-November, Strickler began thinking about committing suicide. Strickler Dep. at p. 28. He would pretend to take all of his medication and vitamins, but would hide the Prozac in his hand, planning to save enough for an overdose. *Id.* He kept the pills in his commissary box. Strickler Dep. at p. 29. No jail personal observed Strickler hide the medication, and his cell was never searched for contraband.

During his incarceration, Strickler was allowed to shave. Strickler Dep. at p. 50. He was given a disposable razor which he had to return when he was finished. *Id.* Strickler testified that he pried the razor blades out of three of them in such a way that the guards would not notice. *Id.* He kept these razor blades in a lawyer's envelope in his cell. *Id.*

On December 19, 2001, a hearing was held in Strickler's divorce proceeding in Wabash County, and Strickler was transported there from the Miami County Jail. Strickler Dep. at pp. 30–1. He took two razor blades and a small bag with thirty-five Prozac pills with him. *Id.* at p. 31. He taped one razorblade to his right buttock and one to the heel of his right foot, the Prozac pills were in a small baggie taped to his underwear. *Id.* Strickler was

not searched either leaving MCJ, or when he arrived at the Wabash County Jail. ("WCJ").

When Strickler arrived at the Wabash County Jail, he was placed in a holding cell, where he took all thirty-five of the pills. *Id.* at 32. As part of the divorce proceeding, Marsha Strickler met with Strickler in a private meeting, but she did not think that he appeared to be under the influence of drugs or alcohol. Marsha Strickler Dep. at p. 24. She did not contact MCJ, Sheriff McCORD, or anyone else to express concern that Strickler was depressed or might be suicidal. *Id.* at. p. 25.

Strickler's mother, Elsie Strickler, saw her son as he left the Wabash County Courthouse, and noted that he seemed to have a silly grin on his face and no color in his eyes. Elsie Strickler Dep. at p. 23. Still, despite her concerns, she did not contact anyone at MCJ to warn them about Strickler's strange appearance and behavior. *Id.*

Strickler was returned the same day to the MCJ, where he fell asleep and did not wake up for dinner. Strickler Dep. at 44. He thought, however, that he heard his cell mate tell the guards to check on Strickler because he didn't wake up for dinner, that "he's laid there forever". Strickler Dep. at p. 44. Strickler did not tell anyone that he was thinking about committing suicide. *Id.* at pp. 49–50. Stickler awoke about midnight and used one of the razor blades to cut a vein in his left arm. *Id.* at pp. 46–7. He then wrapped himself in a blanket so the guards would think he was asleep. He had newspapers to soak up the blood so the guards would not see it. *Id.* at p. 48.

Jail Deputy Matthew Feller was on duty at the time Strickler attempted suicide. Feller Dep. at p. 21. He made rounds, but does not recall if he actually looked in on

Strickler. *Id.* at p. 22. About 12:25, he heard someone pounding on a door, and, going to investigate, discovered Strickler lying on the floor wrapped in a blanket. *Id.* at p. 20–21. He got towels and rubber gloves to administer first aid and applied pressure to Strickler's arm to stop the bleeding. *Id.* at p. 24. By this time, Strickler's whole jail uniform was covered in blood. *Id.* Strickler was taken to the hospital about 1:00 a.m. on December 20, 2001. *Id.* at p. 27.

The Plaintiff has provided additional information which he believes is relevant to establishing that jail guards knew or should have known that he was a high risk for attempting suicide. First, he has submitted drawings which he made while in jail, copies of which are attached as Appendix 1. These drawings depict a gravestone with an inscription and the words, "Dead Man Walking"; a picture of a heart with a sword and an arrow through it, a banner that says "Til Death Us Do Part", two broken wedding rings that say Don and Marsha, and the words, "Long May Ya'll Be Happy"; a picture of mountains and a train track going into a tunnel, with the train ending up in the moon; and a picture of space with an eye that is crying. Strickler Dep. Ex.'s.

In addition, the Plaintiff has included four letters with poem-like writings that could be interpreted as expressing an intent to commit suicide. However, the Plaintiff testified that the letters were written to his ex-wife and his sons. Strickler Dep. at pp. 91–2. He believes the jail guards must have seen the letters and pictures because they were in plain sight on a bench in his cell (Pl.'s Mem. in Opp. at p. 5), but he has submitted no evidence that any MCJ personnel actually saw the writings, and they all deny having seen or read the writings. Def's Mem. in Supp. Strickler testified, however, that one of the guards commented about his pic-

tures being a waste of talent. Strickler Dep. at p. 43.

Prior to his suicide attempt, Strickler took a hose clamp and started to carve his ex-wife's initials on his chest. Strickler Dep. at p. 69. When that was unsuccessful, he used one of the hidden razor blades. *Id.* He stuck toilet paper on it to stop the bleeding. *Id.* at 67. Strickler stated in his Deposition that he wanted to make something like a tattoo. *Id.* Defendant Baker came by and saw the blood. *Id.* He commented to Strickler, "Don't you know self-mutilation is against the law in a county facility?", to which Strickler replied, "No, I'll stop." *Id.* Baker did not ask what Strickler used to cut himself, nor did he log the incident or report it to his superiors. *Id.* Baker has no recollection of this incident. Pl.'s Mem. in Opp. at 9.

The Plaintiff has also submitted evidence that the jail had a written policies and procedures manual which specifically stated that suicidal inmates were to be placed in a holding cell. Gebhart Dep. Ex. 3. Inmates on "suicide watch" are monitored around the clock, and "all items which could be used by the prisoner to harm himself/herself are taken from the prisoner and from the holding cell." *Id.*

Sheriff McCord and Jail Commander Gebhart received training in suicide prevention at the Indiana Law Enforcement Academy, and additional training by Four County Mental Health. McCord Dep. at p. 5, Gebhart Dep. at pp. 8, 10. In-house seminars were also provided to employees at MCJ on suicide prevention. McCord Dep. at p. 9. Jailer Feller, the guard on duty at the time Strickler attempted suicide, attended a mental health class which included training on suicide prevention put on by the Miami County Sheriff's Department.

### III. STANDARD OF REVIEW

The standard a court employs in reviewing a motion for summary judgment is now well-established. Summary judgment is proper only if the record shows that there is no issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). To determine whether a genuine issue of material fact exists, the court must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party. *Estate of Novack v. County of Wood*, 226 F.3d 525 (7th Cir.2000), citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On a motion for summary judgment, the Court must not weigh conflicting evidence, but rather determine whether the non-moving party has presented sufficient evidence for a reasonable fact finder to decide in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Motion should be granted only if no "reasonable jury could return a verdict for the nonmoving party," that is, Mr. Strickler. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 248, 106 S.Ct. 2505. Applying the above standard, the Court addresses the Defendants' motion.

### IV. DISCUSSION

█ Prison inmates have an Eighth Amendment right to be confined under conditions that provide "adequate food, clothing, shelter, and medical care." *Estate of Novack*, 226 F.3d at 529, quoting *Farmer v. Brennan*, 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Included in that right is a responsibility for prison officials to take reasonable steps to guarantee the safety of the inmates in their charge. *Id.* In *Farmer v. Brennan*, the Supreme Court held that a prison official may be liable under the Eighth Amendment only upon a showing that the danger to the inmate is objectively serious, posing a substantial risk of serious harm, and that the prison official acted with "deliberate indifference" to an inmate's health or safety. *Id.* citing *Farmer*, 511 U.S. at 834, 114 S.Ct. 1970.

█ In discussing *Farmer*, the Seventh Circuit noted that the Supreme Court rejected an objective test for deliberate indifference and held that "liability will lie only if 'the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' " *Estate of Cole v. Fromm*, 94 F.3d 254, 258–59 (7th Cir.1994) (citing *Farmer*, 511 U.S. at 837, 114 S.Ct. 1970). It is not enough to show that there was a danger of which prison officials objectively should have been aware. *Estate of Novack*, 226 F.3d at 529, *see also*, *Soto v. Johansen*, 137 F.3d 980, 981 (7th Cir.1998) (holding that mere negligence or even gross negligence does not constitute deliberate indifference.) In one recent case, the Seventh Circuit held that "to be liable under the Eighth Amendment for an inmate's suicide, a prison official must be cognizant of the significant likelihood that an inmate may imminently seek to take his own life and must fail to take reasonable steps to prevent the inmate from performing this act." *Sanville v. McCaughtry*, 266 F.3d 724, 740–41 (7th Cir.2001)

█ In this case, Strickler was not a prisoner, he was a pre-trial detainee. However, the rule in the Seventh Circuit is that the due process rights of a pre-trial detainee under the Fourteenth Amendment are at least as great as the Eighth Amendment protection available to a convicted prisoner. *See*, *Estate of Cole*, 94 F.3d at 259 (citations omitted). Therefore, to prevail, Strickler must establish that the Defendants were aware of a substantial

risk of serious injury—that he would imminently seek to take his own life—and that they failed to take appropriate or reasonable steps to protect him from that known danger.

█ Under this two-prong analysis, Strickler must first establish that the Defendants were aware of a substantial risk that he would imminently attempt suicide before he gets to the question of the appropriateness of their response. In his Memorandum in Opposition, Strickler does not allege that any of the Defendants had actual knowledge that he planned to attempt suicide. Because Strickler really wanted to end his life, he made efforts to conceal his current thoughts and plans to commit suicide from people who might have prevented him from carrying out those plans. The only person Strickler told of his intentions was his cell mate, and he did not tell anyone else. Although Strickler's mother and ex-wife were concerned about him, they did not share those concerns with any of the Defendants. The Defendants all testified that no one told them that Strickler was thinking about committing suicide, and Strickler put in no evidence to the contrary. Def.'s Mem. in Supp. They also deny that he was being held under a "suicide watch", which Strickler disagrees with.

Strickler relies primarily on certain facts which he calls "signs" that should have alerted the jail staff that he intended to harm himself. Pl.'s Mem. in Opp. at 21. These signs included his depression, previous suicide attempts, the pending divorce, the letters and drawings in his room, the fact that he slept through dinner, and others. He claims that, "The signs were so obvious that the most unreasonable person could have figured it out." *Id.* He appears to be claiming that actual knowledge should be inferred from the obviousness of the risk.

In *Estate of Cole*, the plaintiffs made a similar argument, that the defendants "must have known" about the risk because it was obvious. *Estate of Cole*, 94 F.3d at 260. They presented expert testimony from a doctor who gave his opinion that the risk should have been obvious to the defendants. *Id.* The Seventh Circuit noted that in some circumstances, actual knowledge of a substantial risk of serious harm can be inferred by the trier of fact from the obviousness of the risk. *Id.*, citing *Haley*, 86 F.3d at 641.

The suicide victim in *Estate of Fromm* was a pre-trial detainee who committed suicide while confined to an acute care inpatient psychiatry unit. *Id.* at 257. The hospital had two levels of suicide watch, and after an evaluation, the detainee was classified at the lower of the two levels, allowing him some degree of freedom to move around within the ward. *Id.* at 257–58. He managed to kill himself by asphyxiation using a plastic liner from a linen hamper in the psychiatry ward. *Id.*

█ The Seventh Circuit held that the defendants were not liable for the detainee's death because a subjective awareness that plastic bags pose a substantial risk to a patient who intends to commit suicide does not establish the fact that the defendants knew that this detainee intended to commit suicide. *Id.* at 261. A qualified doctor evaluated the inmate and determined, in her professional judgment, that he did not need the suicide precautions attendant to a "high risk for suicide" classification. *Id.* The Court concluded that such a diagnosis was, by definition, the doctor's subjective conclusion regarding the risk that the inmate posed to himself. *Id.*[1]

---

1. The Seventh Circuit pointed out in this case that the Plaintiffs did not argue, and put forth no evidence, that the doctor misdiagnosed the detainee. That would have been an issue of medical judgment, which is evaluated under a

This Court must now look at the facts which Strickler alleges establish the obviousness of his intent to commit suicide, keeping in mind that Strickler's version of the facts must be used at this stage of the litigation, to determine if the risk of serious harm was so obvious that it is fair to infer that the Defendants had actual knowledge of his intent. Strickler bears the burden of proving that all of the known facts, taken together, would allow a jury to infer that the Defendants did, in fact, know that Strickler intended to commit suicide, and also knew that there was a strong likelihood he would do so imminently. The facts presented are as follows:

1. Strickler remained in a holding cell for his entire stay at MCJ. When Officer Maynard took Strickler to general population, Strickler made a comment indicating that he, Strickler, questioned the assessment that he was no longer suicidal. He was taken back to the holding cell. The incident was not logged, and Officer Maynard did not report it to his superiors or ask for another mental health evaluation.

2. Jail policy required suicidal inmates to be placed in a holding cell under "suicide watch". Inmates on "suicide watch" are not allowed to have anything in their cells that could be used to harm themselves, such as razors.

3. Mike Fisher interviewed Strickler and informed two guards to watch him, that he might be suicidal.

4. Strickler used a hose clamp, and then a razor blade to carve his ex-wife's initials on his chest. A guard, Baker, saw the blood and told Strickler not to cut himself. Officer Baker did not ask what Strickler used to cut himself. The incident was not logged or reported to Baker's supervisor. Baker does not remember this incident.

5. Strickler was depressed about his pending divorce. The day he attempted suicide, he had been to a hearing in the divorce case.

6. Strickler was able to stockpile medication and razor blades undetected. His cell was never searched, nor was his person searched going out of or back into MCJ the day he went to the hearing.

7. Strickler's initial mental health evaluation from Four County Counseling Center had checks in the boxes, "thoughts of suicide" and "threats of suicide". However, the same report recommends that Strickler is okay to place in the general jail population.

8. Strickler had drawings and letters sitting on a bench in his cell indicating that he was depressed and wanted to die. The letters seemed to indicate an intent to end his life, but there is no evidence that jail personnel ever read the letters.

9. The day Strickler returned from the divorce hearing, he slept through dinner.

Strickler has included other facts, but they are not relevant on the issue of knowledge. He must first establish knowledge before getting to the appropriateness

different standard. The subjective awareness of substantial risk of serious harm necessary for a finding of deliberate indifference cannot be inferred from the obviousness of the risk in a case of medical judgment. *Estate of Cole,* 94 F.3d at 261. The rule recognized by the Seventh Circuit in *Estate of Cole,* borrowed from the Supreme Court's decision in *Youngberg v. Romeo,* 457 U.S. 307, 322–23, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982) was that deliberate indifference may be inferred based upon a medical professional's erroneous treatment decision only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment. *Id.* at 261–62.

of the Defendants' response, or whether they are entitled to qualified immunity. Again, this Court emphasizes that the standard in this case is not negligence. The question is not, "Could the Defendants have surmised from this information that Strickler might commit suicide?" Rather, the question is whether these facts, taken together, made the risk of harm so obvious that the Defendants actually knew that Strickler was at a high level of risk for imminently harming himself, such that a trier of fact could infer actual knowledge.

Strickler asserts repeatedly that his placement in the holding cell meant that he was on "suicide watch". However, even if he was originally considered at a high risk for suicide, almost two months passed between his transfer to MCJ and his attempted suicide. During that time, he was evaluated by two mental health professionals, and both concluded that he was not likely to imminently harm himself. Although he still had "thoughts of suicide" and even "threats of suicide", the counselor from Four County Counseling Center did not think that Strickler had a present intent to commit suicide, and concluded that it was "okay" to put him in the general jail population, even though it had a lower level of supervision than in the holding cell.

In other words, the counselor concluded that the risk of Strickler committing suicide was not much greater than that of the general jail population, where, as Strickler pointed out, inmates are nine times as likely to commit suicide than people in the general public. Pl.'s Mem. in Opp. at 1. The second evaluation, done by Pearce, was not provided to the jail staff, but they knew from past experience that she would have informed them had she believed that Strickler was at a high risk for imminently attempting suicide.

Strickler's argument is much like that of the plaintiffs in *Estate of Cole*, who argued that because there was evidence that a pretrial detainee intended to commit suicide, he should have been placed on the highest level of supervision for suicide prevention. *See, Estate of Cole*, 94 F.3d at 261–62. But in that case, the Seventh Circuit noted that an inmate also has a substantive due process right to be free from unnecessary bodily restraint. *Id.* at 262. That right is not absolute, but ends "at the point at which his freedom from restraint posed the substantial risk that he would seriously injure or kill himself." *Id.* At that point, an inmate has a right to appropriate treatment, including restraint if necessary to protect him from himself. *Id.* "Where these conflicting rights intersect is a matter of medical judgment." *Id.*

The medical professional must weigh these competing interests in an effort to prevent unnecessary treatment, including unnecessary restraint. *Id.* As the Court noted, "if the defendants bound, gagged and immobilized every inmate for the sole purpose of preventing the inmates from injuring themselves," the pretrial detainee could not have used a bag to kill himself, but such a course of action would clearly violate his right to be free from unnecessary bodily restraint. *Id.*

The Seventh Circuit noted, in *Myers v. County of Lake, Ind.*, that predicting suicide is impossible. *See, Myers v. County of Lake, Ind.*, 30 F.3d 847, 849 (7th Cir. 1994). At best, psychologists can only group inmates in categories based on risk. *Id.* A duty to take the maximum precautions for all inmates with any level of suicide risk would make life miserable for many persons at a low level of risk for suicide. *Id.* Inmates can be deprived not only of obviously dangerous things like razors, but also belts and ties, pens, sheets, blankets, even clothing, for almost any object may be used to harm oneself. *Id.* A caring professional will reserve such

drastic measures only for those considered to be at a high level of risk for imminently harming themselves. *Id.*

Strickler alleges that he was on a "suicide watch," and that certain precautions should have been taken. The Defendants deny that he was on suicide watch. Factual disputes must be resolved in favor of the Plaintiff unless no reasonable juror could believe Strickler. A reasonable juror could believe that Strickler was on some kind of suicide watch, but it does not automatically follow that Strickler was or should have been placed in the highest category of suicide risk. Because the parties do not directly discuss this issue, the Court will look at the facts presented to determine if a reasonable jury could find that the Defendants thought that Strickler was such a high risk for imminently committing suicide that he was placed at the highest level of suicide watch.

The facts indicate that Strickler was placed in a holding cell that was monitored around the clock, that he was evaluated twice by mental health professionals, and that he was given medication for depression. The evaluation report from the Four County Counseling Center, which was read by Defendant Gebhart, noted that Strickler still had thoughts and threats of suicide, but no plans for suicide, and that he could be placed in the general jail population. This would qualify as a medical judgment indicating that the evaluator did not consider Strickler to be in imminent danger of harming himself. In the holding cell, Strickler was given blankets and clothing, and allowed to shave himself with a razor.

The fact that Strickler managed to hide three razor blades and his medication may indicate lax enforcement of jail policies, but the guards did not know that Strickler had the razor blades, or that he was not taking his medication. The lax enforcement cannot be used to show that the guards knew Strickler was highly likely to imminently commit suicide. If anything, it goes the other way, indicating that guards did not consider him a high risk and were allowing him an additional measure of freedom.

The same reasoning applies to the guards decision not to search Strickler when they took him to the divorce hearing. The purpose of the search is for their own safety, and to prevent an escape, and they apparently did not consider a search to be necessary before transporting Strickler. The guards failure to search Strickler or his cell does nothing to help him establish that the guards had actual knowledge that he posed a serious risk of committing suicide, or that such a risk was so obvious they must have known about it.

The Court is most concerned with Strickler's claim that Baker saw him bleeding and allegedly told him, "Don't you know self-mutilation is against the law in a county facility?". That seems a callous response, but it does not establish that Baker knew that Strickler intended to commit suicide. It might support a finding of negligence, but does not support a finding that it was obvious to Defendant Baker that Strickler intended to kill himself.

As to the pictures, the Court has carefully examined them, and included copies as Appendix A, and, with all due respect, fails to see how these pictures could have alerted the Defendants that Strickler intended to commit suicide. They express sadness, frustration, anger, but no clear expression of suicidal intent. Furthermore, they were on a bench in his cell. Strickler does not claim that any of the Defendants ever actually examined the pictures, or read his letters. He testified that guards did not come into his cell. If they wanted to talk to him, they stood just inside the door. Even if they were in plain

sight on the bench, it is too far of a stretch for this Court to assume that the guards would have seen the pictures and letters from the doorway and understood their content.

The final piece of information, that Strickler slept through dinner, also causes some concern because Strickler had already attempted suicide once by taking an overdose. Marsha Strickler Dep. at p. 10. His mother and his wife rushed him to the emergency room where he was treated with charcoal. *Id.* However, that incident did not occur while he was incarcerated, and there is no indication that jail employees knew about it. Strickler had just been to a divorce hearing, he was depressed, the fact that he slept through dinner is not so out of the ordinary as to make it obvious to the jail guards that he was seriously considering committing suicide.

Putting all this information together, and considering the two psychologists opinions, the Court concludes that no reasonable juror could find that Strickler was classified as a high risk for suicide, or that prison guards had actual knowledge that he was a high risk for suicide. With a medical judgment stating that it was "okay" to put Strickler in the general population, meaning that he did not need to be on "suicide watch", no reasonable juror could infer from these facts that the defendants actually knew of a substantial risk of harm to Strickler—that he would imminently attempt suicide—from the obviousness of the risk. Strickler's claim that "jail officials had actual knowledge of a serious risk that he would commit suicide" is simply not supported by these facts.

## V. CONCLUSION

This case illustrates the difficulty for jail personnel charged with the care of inmates who are determined to commit suicide. Because Strickler was serious about ending his life, he deliberately hid his inten-

tions from anyone who might have been able to prevent it. He lied on the intake form, he lied at the Bowen Center, he deceived the guards about his medication and the razor blades. His suicide attempt was tragic, and almost successful, but the facts of this case, taken as a whole, do not support even an inference that these defendants had actual knowledge of a substantial risk that Strickler was serious about killing himself.

Because Strickler fails on the first prong of the analysis, which requires that he establish that jail personnel had actual knowledge of a substantial risk of serious harm, either from direct evidence or by inference because of the obviousness of the risk, it is unnecessary to get to the appropriateness of the defendants' response, or whether they are entitled to qualified immunity. The Defendants' Motion for Summary Judgment must be **GRANTED.**

**IT IS SO ORDERED.**